Good morning, Your Honors. My name is Jason Saunders. I'm from Gordon and Saunders. I represent David Lozano Alvarado. I'd like to reserve three minutes, if I may. I raise a single issue in my case, and that's whether the government proved beyond a reasonable doubt that my client was involved in a conspiracy in western Washington for both methamphetamine and heroin. I gave you supplemental authority for Loveland, and the reason I did so is just because the case was similar in the fact that they ruled on a lack of evidence for a conspiracy. Procedurally, the facts are different. The outcome's different because they didn't also charge an underlying crime in that case. But what the court ruled is conspiracy means an agreement to commit a crime. Without an agreement, there is no conspiracy. Is your argument that there wasn't sufficient proof of a conspiracy or there wasn't sufficient proof that your client was part of a conspiracy? Was part of that conspiracy. You agree there was sufficient proof in this case of a conspiracy involving others? I believe so, yes, Your Honor. And the reason why I think so is because we have, if you look at the four-prong test, I think those other people meet that criteria because you're talking about actual controlled buys and transactions and other people supplying the drugs to western Washington, staying in stash houses and being sold. So I think the government has a pretty good case that there's a conspiracy in western Washington. There was one sort of constellation of events that seemed to connect to your client, and I wonder if you'd comment about that. There was evidence of a trip to California that was going to take place that was part of the conspiracy's plan, and your client asked Mr. Reyes about whether he was the one who was going on that trip, which suggests that he understood the nature of the conspiracy and was at least potentially part of it. And, you know, if the Court would indulge me for just one page of the government's brief, I just want to go through what they set up because it is in the light most favorable to the government. So if we could just go through that. I'm looking at page 12 of the State's answering brief, and what it's really talking about is communication between Reyes and Benitez Castilla. We barely have any evidence of any conversation between Benitez and my client. The only thing we have is, hey, dude, old man, call me. So that's the only evidence we have. What we do have to Reyes is you bring him here and come see me so we can talk, talking about my client. And then he's wondering all the way or not. He goes, okay, he's here, bring him, and perhaps he'll be traveling tomorrow. At that time, he does say, you know, are you the one going to California? Perhaps, and that's important, perhaps I'll be the one that will give you something in California. So I think the easiest way to read this is he's going up there for the first time. We have no evidence that he's ever been in western Washington before to meet Benitez. And maybe Benitez wants to have some kind of heroin supply from the person who gave my client the heroin in the first place. But that agreement hasn't been made yet. What it talks about is Reyes is actually saying, I don't know, the trip down to California hasn't been set, and my clients say, well, perhaps I might be the person who gives you things in California. But isn't there something else here? Your client, as I understand it, is found with drugs in a bag of potato chips? Yeah. And other people in the conspiracy are shown to have transported drugs that way? You know, it's true. I think if it was in his pocket, it wouldn't seem very probative. Right. But a bag of potato chips. Although I will say I've been doing drug cases for 20 years, and that's nothing novel. It's something that's done. Doritos are very popular, I guess. I think so, too. You know, and I wanted to point out another thing that the government is focused on in this case is how there's these stashed cars that are being transported. And another way of doing it is to just bring it by transportation into the western district of Washington. Well, there's barely any other way to do it except for mailing. So it doesn't really add to the commonality of purpose when you're saying, well, this guy does things totally different by actually taking a bus into western Washington while everybody else, the evidence shows, that they're bringing in stashed cars with lots of drugs. How firm does the connection to the conspiracy have to be? Part of my question about your position is that I think the law is that the connection to the conspiracy need only be slight. Yes, yes, but it has to be enough that a reasonable juror could find beyond a reasonable doubt. I just do not think you have, with the 10 minutes of conversation that was made between Mr. Benitez and my client, and with the very small amount of evidence of actually what that contact was, what you really have here, and I think an objective read of this, even inferring all the possibilities to the government, is that you really have these two people, my client and Benitez, meeting for the first time, and they're going to talk, and there might be an offer of going down to California. There might not be, but that's what this whole conversation is. Bring him up here. We're going to talk. Do you know if he's going to be, he might be traveling to the south tomorrow, dude, but there's nothing to say he is traveling south. There's nothing to say. But then the conversations with Reyes suggest that there is traveling to California involved, and maybe he's going to be the one. Yeah, if there's an agreement reached with Benitez. It does seem to me that this 71-year-old senior citizen from California is a mule to bring drugs into western Washington. He is going to meet a kingpin, supposedly, of the western Washington and Tacoma, Mr. Benitez, for the first time. After he evaluates and assesses my client, Benitez might have him involved in the conspiracy and might have him taking drugs down. I don't want to put words in your mouth, but you view this encounter as a job interview. Yeah, exactly, Your Honor, because I don't think there's anything beyond. And he brought his drugs to the job to show that he was capable of performing the job. So even if the jury could reasonably conclude that your story about what those words meant was true, don't we have to determine whether a reasonable juror could determine that it meant that Lozano Alvarado knew that there was a pattern that Reyes was going to come down and that they were going to be part of this scheme? I have trouble seeing why a jury couldn't reasonably determine that alternative scenario, which is all the government has to show. Right. Well, and I think that's what I'm trying to suggest, is that there's such small communication. There's about five different sentences made, and all those sentences point out to a future possible agreement. Are you the one going down to California? Perhaps I'll be the one to get you something in California. And nothing else. There's nothing else saying, I will be the guy who you'll see. He's about to meet this person in Washington for the very first time, and it's not an agreement made yet. It's a prospective mule to bring drugs back. Is he going to be a source of supply in California? We just don't know. And when you look at the different aspects, we're talking about the nature and scheme of the conspiracy, but the most important one to me is the one that talks about the duration, the frequency, and the quality of the transactions. What's important about that factor is transactions means more than contact. Usually it means a selling or delivery of goods. What we don't have here is any communication even as evidence between the two except, hey, old man, call me. That's the extent of the communication between the two. And then there's a small amount of additional evidence that suggests that he might, after talking to Benitez, be a person that could be a source in California. You have about a minute left if you'd like to reserve it. Unless the Court has any questions, I'll reserve the rest of my time. Thank you, Your Honor. Thank you. We'll hear from Mr. Walker next. Good morning. I'm Brian Walker. I have a practice in Vancouver, Washington. I represent Fabian Valdevinas-Perez. I would like to reserve about two minutes if I can possibly manage that. Mr. Valdevinas-Perez appeals his convictions on the four counts that he was charged with, and that's conspiracy to distribute controlled substance, and the three possession charges which all arise out of the search of the trailer on June 27th of 2014. And I'm going to address them in a different order than I briefed it, but I'm going to talk about the conspiracy first because they all kind of flow together this way. In order to prove a conspiracy, the government also has to prove that there is a conspiracy and that Mr. Valdevinas-Perez was a member of that conspiracy. It has to be a discrete conspiracy. They don't have to show everything that he did it, but they have to show that he has some kind of knowledge of it, that he helped support it, that he helped move it forward. There are five factors that are listed in one of the cases I cited. That's in the Bibero case, which was referenced in one of my cases. Excuse me one second. The clock is not moving. Thank you. You're going to get some extra time. I'll get extra time. Wonderful. It's my lucky day. Let me ask you the same question I asked your colleague. Yes, Judge. I take it you don't also don't contest that there's sufficient evidence of a conspiracy. Is it your position that there's not just sufficient evidence that your client agreed to join it? That's correct, Your Honor. I believe there was at least one conspiracy. I think there were several conspiracies, and kind of dovetailing on what counsel said, if there were a conspiracy involving his client, it was a very minor one that didn't involve a lot of the other players. And my position is that Mr. Valdivianos Perez is not identified with any particular conspiracy. He's kind of a dark, shadowy figure in about half of the ten transactions that I've identified in the case. But I do believe there's a conspiracy. So I guess what concerns me about your argument is sort of the parsing of the conspiracy, the one that exists, into various jobs. So if one looks at a conspiracy and one is picky enough and says, well, there's a conspiracy to transport drugs, there's a separate conspiracy to deliver them, there's another conspiracy to manufacture them. If a common core of folks is at the center of that conspiracy, why does your client have to agree to do much more than what he did? Well, it kind of goes back to the case that I cited that talks about there can be 32 conspiracies. There might be one guy at the very beginning of the conspiracy. That's the Koteakos case. And yet you have to show that there's more than just involvement of each person with the center at the hub there. So there can be a lot of conspiracies, but you have to establish that they're at least a member of one of the conspiracies that they're charged with here. All four of these people were charged with one common conspiracy in this case, and I don't believe that the government satisfied the requirement to show that Mr. Valdivianos Perez was a member of that conspiracy, of any particular conspiracy. The ten transactions that I identified, Mr. Valdivianos Perez is kind of loosely associated with about three of them or four of them. In one, he's shown coming out of a jack-in-the-box with someone after a controlled buy. Then he receives an envelope. They don't know what's in the envelope. In one transaction, he's seen going to the trailer that was later searched. And there's also a bunch of communications that reference the drugs or can be understood to reference drugs. Okay. Now, there was one just before the jack-in-the-box episode, I think you're talking about, Judge, where there was some kind of conversation about pretty girls or something like that. The thing about that, though, is there's nothing that links that conversation, which is kind of cryptic as all these kind of conversations are, nothing that links it to that jack-in-the-box transaction. There's nothing that shows that what they're doing is in furtherance of his contact with Mr. Rodriguez-Rodriguez, with Mr. Perez, who is the first informant, or Mr. Lopez, who is the second informant. So what are we to make of his trailer that's full of all the items that one could possibly want in the drug trade? Well, Judge, that goes, of course, to the possession count. Well, it's more than the possession count because of the large amount of money, among other things, and the firearms, which suggests a broader job description, if you will, to carry that metaphor forward than simply possession. And I guess what I mean by simple possession is I'm referring to possession of I'm talking about possession of everything is related to that June 27, 2014, raid of the trailer. Mr. Volodinos is clearly present. There's no question about that. He is present. But they've established that he's present, but just mere presence. What we have is a trailer, and I'll just kind of go through some of the factors that I've located. They find in there, they find drugs. They find cutting agents. They find scales. They find two firearms. One is under a pillow in one bedroom. One is in a closet in the other bedroom. They find men's and women's clothing in one of the closets, men's clothing in the other one. They don't find a promissory note with the alias on it. That's correct, Judge. And then they, whether or not it's the correct alias, the government introduces evidence that it is his alias. Correct. So isn't that enough to connect him with the trailer? Well, I don't think so, Judge. And the reason is that it's kind of like those old TV shows where somebody says, what's your name? And they're looking around the room trying to think of a name. Oh, my name is Mr. Glass because they see a glass on the table. Maybe he saw that and that was the name that occurred to him to use. It doesn't show that he in fact is Mr. Glass. But a reasonable jury would not have to come to that conclusion, would it? I think based solely upon that, I don't believe so, Judge. It is my position that a reasonable jury would not. So let's go through the factors that might support the government's side. He was there. Yes. There's a note there with his alias on it. What else connects him to the trailer? Well, they say that he appeared to have a key at one point on an earlier date. They had surveilled him and he went in. Right. But at the same time, they don't know that it was a key. But at least he went into the place at an earlier date. Whether or not he had a key, it wasn't his first rodeo in this trailer. He may have been there before, but there's nothing that suggests that he had a right to be there. They never checked to see if he's the owner, if he's the registered occupant of the space there, the utilities. We don't know whose name they were in. There's really nothing connecting him. What was his use in your theory? What was his use of the trailer? It didn't belong to him, but he broke into it to sleep in there? Well, we don't really know, Judge. And my position is that the burden wouldn't be for us to explain why he was there. He was present. He was merely present. What more would be needed in your view to establish that he had dominion and control, to use legal terms, over the trailer? Well, I think if they had found fingerprints on one of the firearms, if they had found fingerprints on some of the scales, the packaging material, something like that, if they had found clothing in his size. Because you're making an insufficiency of the evidence already. I am, Your Honor. And so I'm trying to figure out, you know, in your view, how much does the government have to prove, other than they've seen him go in the trailer several times, he's there, he's there when they seize the stuff, and there's at least a piece of paper into place suggesting that he occupies it. Sure, Judge. They saw him go in two times. And there's no evidence as to the duration he was in there or what he did when he was in there. We just have mere presence. The government has to prove more than mere presence. That's pretty clear in the case law, I believe. Are there more questions on that? I kind of wanted to get on to my Brady. I don't believe there are. You have another couple of minutes left. Okay. I'm going to use 40 seconds to talk about the Brady issue here. Well, when you talk about that issue, would you talk about materiality, please, or prejudice? Because it appears to me, at least speaking only for myself, that there was no prejudice from the late disclosure. Right. Well, here's my response to that. The judge found this to be clearly Brady material.  Had they not been able to scramble on their feet at the last moment like that, he would have found prejudice because they might have stumbled over the information or not found an effective way to use it. So I guess there's kind of a ‑‑ there's sort of a policy concern that I have here. So is it your position that if there was no actual prejudice, but if he'd had a worse lawyer there would have been or might have been prejudice, that you get to win? Is that your argument? That's certainly a consideration. That is not my argument. I mean, we're not ‑‑ we can condemn, if there's a Brady violation, we can condemn the government. Right. But I'm not sure we should reverse if it really didn't hurt you. Well, the problem, Judge, is we will never know what the effect would have been, because they didn't receive these until several days into trial after Perez had been testifying for several hours already. How on earth are they supposed to react? Common sense tells us that you have to have it at least two weeks before trial so you can do your own investigation. It wasn't provided until mid-trial and not until ordered to do so. And this is because the government chose to believe the DEA when they said there was no contract because it was just an agreement, as they said. That was just one of the things. Well, let's get back to Judge Graber's question. Sure. What was the prejudice? I mean, you're doing a capable job, it seems to me, of telling me that one can imagine that there might have been prejudice, but what was the prejudice? I guess, Judge, all I can say is we will never truly know. We had four people on trial for very serious crimes. They all got heavy sentences for this matter. And the government just kind of casually provided this stuff halfway through trial. The prejudice is that they didn't have time to do it. And in a trial, we can't say, well, I would have done this and this and this, because the counsel said that. They said we would have conducted additional investigation if we had had time. They simply didn't. In fact, some of the information, they didn't even have a chance to look at it until in court just before the person testified. So I think the prejudice is inherent. There's no time to react. And we can't possibly know. It's kind of like measuring the mass of a moving particle. I don't know how on earth we're going to know under those circumstances. I have 10 seconds left. Any other questions, judges? I don't believe so. Thank you. Okay. Thank you. May it please the Court. Charlene Kosky for the United States. I'll start by responding to Appellant's Brady arguments. He still failed to identify any information he did not receive in time to use at trial. Because he received all that information in time to use at trial, there's no violation. The only information that was disclosed in an untimely fashion in this case is the agreement in the contract. It's a pretty big piece of information. It is. But I will note one thing that I think is not clear from the briefs in this case is that two weeks before trial, I mean, the reason that that agreement had Brady value is the impeachment value that existed in the two provisions, this is what the Court found, that said there was consideration exchanged and that was it until he was convicted of a crime later. That was really the only impeachment value in that agreement. And two weeks before trial, on April 21st, defense counsel received the immigration status of Reyes. They received the total payments the DEA had made to him. And they also received information that he had cooperated in order to help his wife with potential drug charges. Two days later, they received an updated criminal history. They received his I-94 visa documents. They received information that he – They got a lot of stuff. Yeah. All the information. I'm focusing on first – not the prejudice, but it's – the government has a confidential source agreement with a witness. Correct. That's the kind of stuff that should be in the defense's hands ASAP, correct? Correct. Yeah. So let's start out with the notion that this should have been disclosed earlier. Yes, it should have been. Okay. So what are they supposed to do to show prejudice from it? Well – Your colleague, I think, with some force, says, how can I tell? You're asking me to put the water back in the bottle. Well, I think under this circuit's precedent, you can tell by the fact of whether it was used at trial. It was not only used at trial, it was used throughout the trial with multiple witnesses and referred to repeatedly in closing arguments. I mean, they – and they had all of the actual impeachment value connected to that agreement in two weeks before trial. So I mean, really, the only thing they didn't get was the agreement itself. But they knew that agreement existed, which is based on the information they received, that said the DEA had – that he was cooperating, the DEA had paid him and was helping him with his immigration information, which they had two weeks prior to trial. So I think in order to show prejudice, he has to show that he wasn't able to use it at trial. He can't show that in this case. So do we look at the cross-examination and say it was – it looks effective on paper and therefore there wasn't prejudice? Well, I don't – I mean, he had the opportunity to use it effectively, and I think that's all that matters. In this case, I actually think it was used effectively, and I think that that's clear. I mean, in closing arguments, they heard here are 10 things you need to know about Daniel Reyes and went through. Seven of the 10 things they listed had to do with the fact that he – had to do with either the conviction or his compromised status as an agent or as a confidential informant for the DEA. I mean, they used it. They used it on cross-examinations. They asked Reyes about it. They asked Agent Jensen about it. They asked Agent Satchell about it. What if they – they used it and testimony was given on it, and I think that that's sufficient to get you no prejudice under the case law. Excuse me. I'd appreciate your addressing the sufficiency argument with respect to Mr. Lozano. Again, just speaking for myself, I found the evidence very, very thin in terms of connecting him to the conspiracy. Okay. So, I would note that one thing that wasn't – that didn't come up earlier is, I mean, he was paid – and I'm just going to start. He was paid $1,000 to carry a chip bag to Benitez Castillo. He told the agent, and the agent testified that Mr. Lozano Alvarado believed that he had gotten that chip bag from a drug dealer and that he was going to be receiving drug pursuits from Benitez Castillo. There were communications between Benitez Castillo and Lozano Alvarado while he was bringing the drugs up. And then, in addition to that, you have the surrounding evidence that Benitez Castillo texted and addressed to Reyes to go pick him up and bring him and said, we are looking into that thing about the ride south to see if he leaves tomorrow. He also said, maybe he will travel tomorrow, dude. And we know through other evidence and testimony that conspiracy members referred to trips from Mexico-California area with drugs as the ride, and that's from other evidence. So, when he's talking about the ride, that's what he's talking about. We also know that Reyes had been discussing with Benitez Castillo a possible ride south and that this text exchange suggests that Lozano Alvarado was at least aware that this discussion was happening. He was at least aware of a broad project involving others to bring drugs from the south to distribute in Washington, and he took a step toward accomplishing that goal by getting on the bus and agreeing to be paid $1,000 to take heroin to Benitez Castillo. He also, the chip bag came up. That's another piece of circumstantial evidence that the jury could infer connected him to the conspiracy. And he was also carrying heroin, and we know the conspiracy deals in heroin. And I think I've cited samples of that in our brief, so I won't go over them now. When he was stopped, he acted suspiciously. He seemed to know that there was something unlawful in the bag. I'm not sure. It seems to me the fact that he acted nervously when he was stopped carrying heroin in a potato chip bag is not necessarily evidence of conspiracy. It's evidence that he was carrying heroin in a potato chip bag. I think it's circumstantial evidence of that part of it. It doesn't get me out of possession. But of that part of it. To the extent he suggests he didn't know that there was anything in the bag. I mean, I think all of his evidence adds up. That's certainly true. I mean, yes, there's plenty of evidence from which a jury could conclude that he had heroin and he knew it. But I have the same difficulty, I guess, as Judge Hurwitz is having of seeing an agreement or evidence that he was part of a conspiracy as distinct from simply being a mule. Well, and then we have his comments that he made to Reyes, which this court takes as credible because the jury found them credible, which is Lozano Alvarado asked Reyes, are you the one who is going to California? Clearly he knew that someone that he's involved with, the person who's picking him up to take him to Benitez Castillo, is maybe the person who is going to be going to California, who Lozano Alvarado then says that he was possibly going to be the contact for that person going forward. He's aware that this unlawful conduct is happening, and he is taking steps to further that objective. And that's enough. The comments, his comments to Reyes demonstrate that he knew the conspiracy's purpose and that he intended to help accomplish that purpose. And that's enough to get you to support the jury's verdict. Are there, if there are no further questions? Well, why don't you, as long as you're talking about sufficiency of the evidence, turn to the trailer, different defendant, but turn to the trailer and tell me, from taking an alight most favorable to the government, what do you have to show dominion and control as opposed to mere presence? Well, preliminarily, I would note that his arguments on sufficiency of evidence regarding those counts are not sufficiently preserved. He did not raise them in a timely fashion before the district court judge in his Rule 29 motion, and the court should not have reached them. And this court doesn't have jurisdiction to reach them. If this court disagrees with that analysis and does decide to reach them on plain error, then this court doesn't have jurisdiction to reach them. Well, procedurally explain your position on that to me. The district court did reach them. Well, the district court, his initial Rule 29 motion, which was filed the day before the government rested, was only based on count two. At the end of the trial, it was only based on count two. No, I understand your waiver argument. My question is this. If the district court nonetheless addresses the argument on the merits, notwithstanding the fact that it wasn't timely raised, does that mean it's not preserved for appeal? I believe so. I believe it's a jurisdictional. I don't think the district court had jurisdiction to reach it. So you think that the JOMOL statute is jurisdictional, that the district court may not? Based on? May not address the issue, even though, because of the procedural? I would add to that question sort of to respond to the fact that in recent years, the Supreme Court has been whacking away rather enthusiastically against calling things jurisdictional that are not strictly so. Right. And I would say, I mean, I have a few cases here, and there's one that's cited in the record that the government cited in its response to that motion that says exactly that. And there's a Supreme Court case that is Carlisle. But weren't those cases in the context? I may be wrong. Could I just get the Supreme Court case? Sure. It's Carlisle v. United States, and the site is 116, well, actually 517 U.S. 416. It's a 1986 case. I may be wrong about Carlisle, but aren't those cases that say as an appellate court we lack the jurisdiction to address the sufficiency of the evidence if it wasn't appropriately raised below? In other words, do any of the – I don't know that any of those cases deal with this situation, where you've got a reasonable argument, they didn't follow the rule, but the judge nonetheless said, I'll rule on this, and you lose. And so are there any cases that say that we lack jurisdiction to address that when that occurs? I actually, in Carlisle, the Supreme Court held that the district court did not have authority to grant the untimely motion that was filed. The district court did it anyway, and that was reversed. Granted it. Right. So, yeah, I mean, there's a factual distinction there. And I do think that – And it's an old case. It's an old case. And there's been a whole lot of subsequent development in what's jurisdictional and what isn't. Yes, and I didn't – I didn't – We took you on a detour and frolic, but you invited it. Right, I did. So why don't you tell us what the evidence is? Okay. So the evidence connecting him, you're interested in the firearms? Yeah. Okay. Well, there's a – The question on the trailer. The question is, can these be attributed to him? And so we have – Yes. We have to have more than the fact that he was present. So we have more than mere presence here. We have that he was the only person in the trailer at the time of the search, that he was seen using what appeared to be a key to enter the trailer, that there was the promissory note and his pseudonym that he used, found in the trailer. His phone was on the kitchen counter in the trailer. There were drugs on the bed in the condition as they had been packaged. And text messages from him at the time with Benitez-Castillo suggested that he was packaging for a deal that they were about to make between Benitez-Castillo, Rodriguez, Rodriguez, Rodriguez, with a CI. That deal never actually happened, but the text messages suggested the packaging that he was doing was for that deal. He was also there. He came to the window. He ran. The firearm was located in the same room where the drugs were being packaged, at least one of them was. The other one was located under the pillow next to a stash of about $23,000. So, I mean, all that taken together is much more than presence. So he didn't – it sounds like your argument is in part, it didn't matter whether he was renting it or owning it. If he was using the premises to package drugs, he was sufficiently exercising dominion and control. That's correct. The government's not required to prove ownership. It's just dominion and control. And the evidence here was more than sufficient to show that. So while you're talking about the evidence, would you address, and I keep getting the two defendants' names mixed up, but would you address the second argument with respect to proof of participation in the conspiracy, Mr. Valdivantes' argument? Yes, and his argument seems to be based on the notion that separate acts constitute separate conspiracies, which this Court rejected in Kearney. There can be separate acts. There can be sub-agreements. There can be sub-groups within a single conspiracy. And my understanding of both defendants' arguments is that they do concede that this conspiracy existed. The question is just whether or not he was a member of the conspiracy. And evidence chronologically tying Mr. Valdivantes-Perez to the conspiracy include, in August or September of 2013, he delivered drugs to a confidential informant on behalf of Benito's Castillo. The drugs were ordered from Benito's Castillo. He said he was going to send someone else to pick them up. Mr. Valdivantes-Perez actually delivered them, and then the confidential informant later paid Benito's Castillo for the drugs. In December 2013, Mr. Rodriguez-Rodriguez talked with Mr. Reyes about making a trip to California, using a car with secret compartments to bring drugs back, said the car would hold about 10 to 20 kilos. In January, Rodriguez-Rodriguez said that it would actually be Mr. Valdivantes-Perez who would be driving the car from California, referred to him as his nickname, Thalia. A short time later, on February 4th, Mr. Valdivantes-Perez was stopped in California, driving a car, holding 15 kilos, which is consistent with the description that was given of the car, of meth hidden in the compartments. And they have his driver's license, they have his biometrics, there's no dispute that it was him who was driving the car. On June 16th, after picking up a confidential informant, Rodriguez-Rodriguez drove in an evasive manner back to the trailer, went inside, came outside in a hooded person, came out of the trailer, handed the informant samples of heroin and methamphetamine. A few days later, Mr. Valdivantes-Perez was observed at the same trailer, involved with a drug deal concerning Mr. Rodriguez-Rodriguez. Mr. Valdivantes-Perez was given an envelope and then returned to the trailer. Text messages between Mr. Valdivantes-Perez and Rodriguez-Rodriguez and Benito Castillo discussing drug deals, many of those were introduced at trial. Those are described in our brief, so I won't go through a lot of them. The drugs in the trailer, again, suggesting that he was packaging for a sale that was being conducted by Rodriguez-Rodriguez and Benito Castillo. His car was photographed at the trailer the conspiracy was using. And then there were another, the sheer number of contacts between him and some of the other conspirators suggested that they were involved, those contacts happening around the dates of the transactions that were part of this case. I can go through those quickly. May 12th, there were six contacts or attempted contacts between Valdivantes-Perez and Benito Castillo. June 16th to 18th, there were 64 contacts or attempted contacts with him and Benito Castillo and two between him and Rodriguez-Rodriguez. June 19th, there were 17 contacts or attempted contacts with him and Benito Castillo and 16 with him and Rodriguez-Rodriguez. June 26th to 28th, which is when the arrest occurred, there were 33 attempted contacts or contacts between Valdivantes-Perez and Benito Castillo and 15 between him and Rodriguez-Rodriguez. That's a summary of the evidence that was presented connecting him to the conspiracy. Thank you, counsel. I don't believe we have any more questions. Okay, thank you. We ask that you affirm. Thank you. I believe, Mr. Saunders, you have some rebuttal time. Thank you, Your Honors. What I would like to say is I think what we have here is a pre-agreement, a pre-conspiracy from my client. He's a man who has never had a transaction yet. He has never entered Washington State yet. He doesn't know a single person has ever met a single person in the conspiracy. He is bringing heroin up, and the government would like it to be for Mr. Benitez and for money to be exchanged and bring it down, but we don't even have proof of that. What we have is that he was supposed to bring these drugs up. Maybe he meets Mr. Benitez and shows them, but then sells to someone else. We just don't have any direct, even circumstantial evidence that that was intended for Benitez. The only way the government can say that it was for Benitez is because Mr. Benitez says there's no drugs on him, so that's their evidence, there's no drugs on him. And the only way the government can respond that, of course, that was meant for him is, well, he lied. It's their evidence they're bringing forward. They don't have any expert that says people lie when they're asked if he has drugs on him or any theory presented by any officer at all. So all we have here is an attempt to go up to Washington State, and I don't think there might be an attempt to possess and distribute heroin. I don't think there's an attempted conspiracy. There has to be an agreement, and the very language of the very small conversation is my client asks Riez, are you the one who is to go to California? And the response is, well, perhaps I am the one who will give you some things down there. So there's not even a discussion about him being the person driving. There's only a discussion that he's going to head back, and perhaps if things work out with Benitez, he might be the contact person. But there's been no agreement yet, and I think that's what the evidence shows. Thank you, counsel. Mr. Walker, your time expired, but we'll give you a minute for rebuttal if you want to use it. I'm going to go back to the Brady issue just briefly here. The reason it's so critical in this case is because Perez, who's the one who gives all the information that links Mr. Valdovinos Perez to the so-called conspiracy, his credibility is critical in this case because without him, we don't have, if we take his testimony out, if the jury doesn't believe him, for example, if they'd had adequate time to really prepare for this, and granted, they did a good job, but had they had more time, perhaps they could have neutralized him. We wouldn't have the 2013 delivery of methamphetamine. We wouldn't have the nicknames Chiquito and Talia. We wouldn't have that. So we wouldn't have the link to all those phone contacts. We wouldn't have the link to the person driving the vehicle up from California as being Talia because nobody would have known that. That all comes from Mr. Perez. And there's an interesting thing about that vehicle coming up from California is that when stopped in Ontario, California, it has crystal methamphetamine. Now, according to Mr. Perez, Mr. Benitez told him that it was liquid methamphetamine that they were transporting up, that it was always kept in the gas tank of a diesel vehicle. That's how it was being transported, not that it was crystal. So there doesn't seem to be a natural connection, except for as made by Mr. Perez for almost all the contacts, except for when he's witnessed at the trailer. Thank you, counsel. Thank you. The case just argued is submitted, and we appreciate the arguments from all counsel. That's been very helpful.
judges: Graber, Ikuta, Hurwitz